**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
VENSEL HARDY,

Petitioner,

-against-

JAMES T. CONWAY, SUPERINTENDENT,
ATTICA CORRECTIONAL FACILITY,

Respondent.
-------------------------------------------------------X

<u>**MEMORANDUM OF**</u>
<u>**DECISION AND ORDER**</u>
03-CV-6197 (ADS)


<u>**APPEARANCES:**</u>

**JAMES C. NEVILLE**
Attorney for the Petitioner
P.O. Box 1711
16 North Washington Street
Port Washington, New York 11050

**THOMAS J. SPOTA, DISTRICT ATTORNEY**
**COUNTY OF SUFFOLK**
Attorney for the Respondent
Criminal Courts Building
200 Center Drive
Riverhead, New York 11901
      By:    Glenn D. Green, Assistant District Attorney


**SPATT, District J.**

      Vensel Hardy (the "petitioner") petitions this Court pursuant to 28 U.S.C.

§ 2254 for a writ of habeas corpus. The petitioner seeks to vacate the August 19, 1999

judgment of conviction and sentence, which were entered after a jury convicted him of

robbery in the first degree, robbery in the second degree, and criminal possession of a

weapon in the third degree.  The County Court sentenced the petitioner to concurrent terms of imprisonment of twenty-four years to life for his robbery convictions, and a term of sixteen years for weapons possession.  The term for weapons possession was set to run consecutively to the petitioner's prison terms on the robbery counts.  The New York Supreme Court, Appellate Division, Second Department, affirmed the conviction, People v. Hardy, 295 A.D.2d 365, 743 N.Y.S.2d 287 (2d Dep't 2002), and the New York Court of Appeals denied leave to appeal, People v. Hardy, 98 N.Y.2d 710, 778 N.E.2d 559, 749 N.Y.S.2d 8 (2002).

The petitioner raises two arguments in support of his petition:  (1) that the trial court improperly denied the petitioner's Batson challenges at jury selection; and (2) that the prosecution's failure to disclose Brady material constituted prejudicial reversible error.  The petitioner raised both of these grounds on direct review and they are, thus, properly exhausted.

I.      BACKGROUND

A.      Facts Relating to the Identification of the Petitioner

The petitioner's convictions arose out of the November 11, 1998 armed robbery of a Coastal Gas Station in Medford, New York.  At some point, the petitioner became a suspect and was identified as the perpetrator by the victim, who was the gas-station attendant.  There were two identification procedures used in this case.  First, the victim Hasan Mentese ("Mentese") was shown a photo array at the Coastal Gas

Station.  Although Mentese did select the petitioner's photograph from the array, he was not completely sure.  At a later time, two in-person line-ups were conducted at the police station.  Mentese recognized the petitioner at both line-ups.

Prior to trial, the petitioner made a motion to suppress the identification.  The prosecution consented to a hearing under United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967).  On March 12, 1999, the trial court held a pre-trial hearing which was, in part, a Wade hearing.

At the Wade hearing, Detective Anton Pravetz of the Suffolk County Police Department testified about the identification procedure.  On November 11, 1998, Detective Pravetz went to the Coastal Gas Station to show a photo-spread to the victim.  Mentese had previously described the perpetrator as a black male, approximately 30 to 35 years old, with a medium complexion, and wearing a dark, hooded, sweatshirt, zippered up with the hood pulled tight around his face.

Detective Pravetz showed Mentese five photographs.  One of the photos was of the petitioner.  The remaining four photographs were of African-American males, approximately the same age, with the same head and facial hair, the same complexion, and who resembled the petitioner.  Mentese was instructed not to assume that one of the photographs was the perpetrator.  After reviewing the photographs, Mentese selected "number 3," which was the photo of the petitioner.  However, Detective

Pravetz testified at the <u>Wade</u> hearing that Mentese told him that he could not be positive that "number 3" was the perpetrator.

On November 18, 1998, Detective Pravetz learned that the petitioner was under arrest on an unrelated charge and being held at the Sixth Precinct in Coram. Detective Pravetz responded to the Sixth Precinct and questioned the petitioner for a period of time. At approximately 7:57 on the evening of November 18, 1998, the petitioner was taken to participate in a line-up. The petitioner was permitted to select his own number to hold in the line-up. Detective Pravetz instructed the other detectives that were present to have the petitioner and the other participants in the line-up put on dark blue hooded sweatshirts, and to zip them up and pull the hoods tight around their faces.

The line-up participants were all seated in order to eliminate any height differential between them. The other participants in the line-up were black males, approximately the same age, with the same head and facial hair, the same complexion, and who resembled the petitioner. Also, Mentese was instructed not to assume that the man who robbed him was present. After viewing this line-up, Mentese stated that he recognized "number four," the petitioner, as the man who robbed him.

Mentese was then removed from the line-up room and the men were repositioned. This time, the petitioner chose to hold "number three." The men kept

the hooded sweatshirts on.  After viewing the second line-up Mentese stated that he recognized "number three," the petitioner, as the man who robbed him.

On cross-examination, Detective Pravetz was asked about statements that Mentese made to him during the initial encounter at the Coastal Gas Station.

> Q. Did he specifically tell you that he couldn't see [the perpetrator's] face?
>
> A. No.  He didn't say he couldn't see his face.  What he -- What he tried to explain to me in his broken English was that the hooded sweatshirt was tight around the face and that it was -- he didn't see a whole head so it was difficult for him to pick out other features, hair, ears.  So it was like he didn't see it well.  In his mind, well, it wasn't he didn't see the whole person but he was able to see the face.
>
> Q. But he did indicate to you -- and I think if you wrote it down -- that he could not see his face well; is that right?
>
> A. That's the way he explained it.  He said: I could not see his face well, meaning that it was partially covered with the hair and the hair was covered, the ears were covered up to the lower portion of the chin.
>
> Q. And he said the reason was that he had a hood pulled up?
>
> A. He had a hood pulled tight to his face.
>
> Q. But after you got that information from him you felt you still were going to show him the picture of Vensel Hardy that you obtained, correct?
>
> A. Absolutely.  I'm interested in facial features and he did tell me he could see facial features so . . .

(Hearing Tr. at 74-75.)

On April 21, 1999, the Honorable Gary J. Weber issued a written opinion in which he concluded, among other things, that the two identification procedures used in the case were proper and not unduly suggestive. Thus, Judge Weber denied the petitioner's motion to suppress his identification.

On April 27, 1999, during the course of the jury selection, the petitioner made a motion to re-open the Wade hearing. The petitioner made this motion based on the content of the grand jury testimony of Mentese, which the petitioner had only received and reviewed on the prior evening. The petitioner's counsel argued:

> Your Honor, I am making an application to reopen the Wade hearing which the Court has already ruled on the basis that certain Brady material was not provided to me in time for me to make use of it at the Wade hearing.
>
> Your Honor, basically what that amounts to is the Grand Jury testimony of Hasan Mentese that I received yesterday and I reviewed last night in which he indicates on pages 14 and 15 that he had an inability at the corporeal lineup to make an identification of my client unless my client should have a hood on.
>
> Your Honor, that information would indicate to me that he was unable to make an identification of him. And he's reaching out for some strange thought process that he would need a hood. Would seem like a hood would diminish his ability to make an identification, not enhance it.
>
> In any event, what he says is, reading from it, "Question: I direct your attention to November 18, 1998. Did you go to the Sixth Precinct?
>
> "Yes, I did.

Page 15:        "Did you participate in an identification
                procedure that day?"  He says, "Yes, there
                were five persons.

        "Question:      And of those five persons, did you recognize
                any of those five persons to be in your gas
                station on November 11?

        "Answer:        Yes, I did.

        "Did you recognize one of the persons to be the one with the
shotgun?

        "Yes.

        "And did you communicate that to the police?"

        And this is the important part of it.  "I told the police they
should have a hood on.  Because that day the person had a hood on.
So I would not -- I wouldn't be able to recognize if they didn't put
the hood on.

        "And did the police put hoods on?

        "Answer:        Yes, they did.

        "Question:      And once the hoods were on, did you
                recognize that person?

        "Twice."

(Trial Tr. at 217-218.)

        According to the petitioner's trial counsel, this grand jury testimony was <u>Brady</u>

material because it indicates an inability of Mentese to make an identification of the

petitioner, and that from the fact that Mentese could not identify the petitioner without

the hood it can be inferred that the line-up was suggestive.  Judge Weber denied the

petitioner's request to re-open the <u>Wade</u> hearing, stating that it was sufficient that the petitioner's counsel could cross-examine Mentese about his grand jury testimony regarding the need for the hood, and that the line-ups "certainly" were not suggestive because "they all wore hoods."  (Trial Tr. at 230.)

**B.      The Jury Selection**

At the trial and the jury selection, the petitioner was represented by Henry O'Brien, Esq.  During the selection process, the prosecution exercised peremptory challenges to excuse two African-American jurors.  The defendant opposed the exclusion of each potential juror under <u>Batson</u>, and the trial court denied both motions. For the purpose of this discussion, the Court has refrained from using the name of the second prospective juror that was excused because of the personal nature of the statements that led to her dismissal.

**1.      Yvonne Patterson-Quirk**

Yvonne Patterson-Quirk, prospective juror number 14, stated during voir dire that she was president of the Islip branch of the NAACP.  When questioned by Assistant District Attorney Loeffler, Patterson-Quirk gave the following answers:

> MS. LOEFFLER:       Mrs. Patterson-Quirk, you said you're president of the NAACP?
>
> PROSPECTIVE JUROR NO. 14:       Yes.
>
> MS. LOEFFLER:       What are your duties?

PROSPECTIVE JUROR NO. 14:     All intake of phone calls to the branch. I run all the meetings. And I sit on every committee.

MS. LOEFFLER:     So when people call in, if they have a problem, would you discuss that problem or do you assign someone else to help them?

PROSPECTIVE JUROR NO. 14:     First I let the people know that we don't take any complaints unless they put it in writing and have their signature notarized. And then sent onto the committee that handles that particular problem.

MS. LOEFFLER:     And in your capacity there, have you had complaints about police officers?

PROSPECTIVE JUROR NO. 14:     Oh, definitely.

MS. LOEFFLER:     And do you refer those out to attorneys, for these people to get help from an attorney?

PROSPECTIVE JUROR NO. 14:     Yes.

MS. LOEFFLER:     Have you even referred anything to Mr. O'Brien?

PROSPECTIVE JUROR NO. 14:     Yes.

MS. LOEFFLER:     Did you ever meet him personally before today?

PROSPECTIVE JUROR NO. 14:     I think he showed up at one of our branch meetings. But I don't know him personally.

(Trial Tr. at 90-92.)

Following voir dire, the prosecution sought to exercise a peremptory challenge to excuse Yvonne Patterson-Quirk, and the defense raised an unsuccessful <u>Batson</u> challenge.

| | |
|---|---|
| MR. O'BRIEN: | I'm objecting to the peremptory challenge of juror number fourteen, Yvonne Patterson-Quick, who is an African-American, who is the N double A C P branch of the Islip Branch organization. |
| | Basically, people who are black in color who are active in the black community, belonging to the N double A C P, we can never have a person who is actively involved in the community. She's the only person on the jury right now. And I think I feel that it's an objection under Batson. |
| THE COURT: | Well, do you think it's objectionable under Batson because she's black or she belongs to the N double A C P. |
| MR. O'BRIEN: | I think it's because she's black. If she belongs to the N double A C P, and I happen to belong to the N double A C P, I draw it's a challenge because she's black and a member of the N A A C P. I don't think a person who belongs to the N double A C P – |
| THE COURT: | Is a member of the N double A C P necessarily a Batson type? |
| MR. O'BRIEN: | It's just that she is involved as a black person in a black organization that I happen to be also a member of. I don't think that should be ground for a peremptory challenge. She's black. |

| | |
|---|---|
| THE COURT: | Well, that's true. But my point is, does Batson apply to membership in certain organizations, or is it tied exclusively to racial and religious groups? |
| MR. O'BRIEN: | One moment, your Honor. |
| THE COURT: | I think the answer is it's more in that kind of category then membership in a particular organization. Anyway, what do you have to say about all this? |
| MS. LOEFFLER: | Judge, I think Mr. O'Brien's argument is made too early. He has to show a prima facie basis before I have to give a race-neutral or organization-neutral reason. And he has to establish that there is a pattern of purposeful discrimination here. |
| | There is another black juror I've noticed in the audience. If she takes the seat, maybe his argument could be made at that point. |
| | One, the argument is made too early. Number two, I never heard an argument on Batson that the person is a member of an organization. |
| THE COURT: | How can you if there is only one? |
| MS. LOEFFLER: | I don't think you can. There is no pattern of discrimination here. |
| THE COURT: | I tend to agree with you. But just to protect the record, why are you excluding her? |
| MS. LOEFFLER: | I am excluding her because she has prior dealings with Mr. O'Brien. She has indicated that her office sends cases to attorneys. And she has sent cases to Mr. O'Brien. And she even said he attended one of their meetings. |

|  |  |
|---|---|
|  | He's a member of the organization. I want jurors that have not had any dealings with both myself and defense counsel. |
| THE COURT: | What do you say to that, Mr. O'Brien? |
| MR. O'BRIEN: | Well, just simply, that prohibits any member of the local N A A C P realy from being on the jury that I'm the lawyer on because I'm involved with the N A A C P. That's unfair. |
| THE COURT: | Doesn't prohibit them. |
| MR. O'BRIEN: | Basically it comes down, if I want to defend black people, I better not join any organizations that affiliate themselves with people who are African-Americans. |
| THE COURT: | Why? |
| MR. O'BRIEN: | I belong to an organization, N A A C P. I'm involved with it. Therefore, people who sit on the jury may know me. And, therefore, I can't join the N A A C P. |
| THE COURT: | You can join it. It's a question of the dealings issue. |
|  | Let me just dispose of it in this way. I find that there hasn't been a pattern of discrimination been established principally because this is the first and only black prospective juror that was excused. |
|  | But, besides all of that, the prosecutor has a valid nondiscriminatory reason. And I would even go so far as to say if she wanted to exclude them because they were a member of the N A A C P, the can do that too. I don't see the membership in any organization is |

something that is protected under Batson. I
think the District Attorney is correct in that.

(Trial Tr. at 120-126.)

## 2. Prospective Juror Number Four

Later in the jury selection process, in response to voir dire by the court,

Prospective Juror Number Four stated that she had been the victim of a crime because

she was a battered spouse. (Trial Tr. at 253-254.) Prospective Juror Number Four

was African-American. The defense raised its second <u>Batson</u> argument after the

prosecution stated its intent to exclude this potential juror by using a peremptory

challenge. Judge Weber denied this <u>Batson</u> challenge also.

> MR. O'BRIEN: I would object under Batson to [Prospective Juror Number Four]. She's the only other African-American probably could serve on the jury with the exception of Miss Silver. And she had nothing except fair answers to all of the questions with respect to her treatment with complaint concerning spousal abuse. She said the police were fine. Everything was okay. And I can't help but feel the only reason she's being challenged is because she's black in color.

> THE COURT: Well, she's the third person black in color that has been involved. And of the two previous, one was rejected and one is on the jury. Where is your pattern?

> MR. O'BRIEN: Well, there's very few African-Americans on the panel that we can deal with. We only had – this is like the third one.

| | |
|---|---|
| THE COURT: | I agree it happens there have only been a few in these groups. But of those that have come up to bat so to speak – maybe that's apropos, I don't know, at bat – the prosecution has deseated one. Which is thirty-three and a third percent. Higher than the population ratio in Suffolk if we look at it that way. Which is around sixteen I think. |
| | But in any event, just so the record is preserved, why did you exclude [Prospective Juror Number Four]? |
| MS. LOEFFLER: | Judge, for the record, I don't believe that Mr. O'Brien has shown a prima facie case of a pattern because we did choose an African-American juror yesterday. And there is one seated on the panel. I would object to us stating a reason. |
| | Since the Court has asked: Because of, Judge, her background, being a battered spouse. The way that she was nodding to some of the questions. And I believe that based on her background as a battered spouse, she might not be able to stick to her guns one way or the other and be fair and impartial when they're deliberating. |

* * *

| | |
|---|---|
| THE COURT: | . . . I'll deny the Batson application. |

(Trial Tr. at 323-326.)

14

### C. The Appellate Division's Order

On April 25, 2002, the Supreme Court, Appellate Division, Second

Department, affirmed the petitioner's conviction and sentence. The Appellate

Division ruled that

> The trial court providently exercised its discretion in denying the defendant's application to reopen the <u>Wade</u> hearing . . . based upon the People's failure to timely disclose the Grand Jury testimony of the complainant regarding a lineup identification. We disagree with the defendant's contention that this testimony constituted <u>Brady</u> material. Even assuming that the testimony was <u>Brady</u> material, the failure to timely disclose does not warrant reversal since the testimony was disclosed during the jury voir dire, and the defendant had use of it for cross-examination purposes.

<u>People v. Hardy</u>, 295 A.D.2d 365, 743 N.Y.S.2d 287 (2d Dep't 2002) (citations

omitted). The Appellate Division also rejected the petitioner's remaining argument,

namely that the trial court improperly denied his <u>Batson</u> challenges at jury selection,

as "without merit." <u>Id.</u>

## II. DISCUSSION

As an initial matter, the Court notes that although counsel has been appointed

for the petitioner, all of the documents submitted on this petition were prepared by the

petitioner when he was acting <u>pro se</u>. Thus, the Court will liberally construe his

submissions in his favor. <u>See</u> <u>Chang v. United States</u>, 250 F.3d 79, 86 & n.2 (2d Cir.

2001).

**A.     The Standard of Review**

The Antiterrorism and Effective Death Penalty Act (the "AEDPA") provides that a federal court may grant habeas relief to state prisoners with respect to any claim that was adjudicated on the merits in state court proceedings only if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005); Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004).  A state court's factual findings enjoy a "presumption of correctness" that the petitioner must rebut by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

"A state-court decision is 'contrary' to clearly established federal law within the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed' to the relevant Supreme Court precedent."  Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)) (internal quotation marks omitted).  "A state court decision involves 'an unreasonable application' of clearly established Federal law if the state court applies Federal law to

the facts of the case in an objectively unreasonable manner." Brisco v. Phillips, 376 F. Supp. 2d 306, 311 (E.D.N.Y. 2005); see Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1439, 161 L. Ed. 2d 334 (2005) (citing Williams, 529 U.S. at 405, 120 S. Ct. 1495, 146 L. Ed.2d 389); Serrano v. Fischer, 412 F.3d 292, 296 (2d Cir. 2005) (citations omitted). "[I]it is well-established in [this] Circuit that the 'objectively unreasonable' standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." Rosa v. McCray, 396 F.3d 210, 219 (2d Cir. 2005) (citing Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003)). Under the AEDPA, a court does not decide "whether the state court correctly interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court's interpretation was unreasonable in light of the holdings of the United States Supreme Court at any time." Brown v. Greiner, 409 F.3d 523, 533 (2d Cir. 2005); see also Williams, 529 U.S. at 405, 120 S. Ct. at 1495.

It is well-settled that "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)). In this regard, the United States Supreme Court opined that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). On the contrary, "a federal court is limited to deciding whether

a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68, 112 S. Ct. 475 (citations omitted).

**B.      As to the __Batson__ Claim**

In Batson, the Supreme Court ruled that the Equal Protection Clause of the Fourteenth Amendment "forbids the prosecutor to challenge potential jurors solely on account of their race." Batson v. Kentucky, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719, 90 L. Ed. 2d 69 (1986). To establish a Batson violation, a defendant must first make a prima facie showing of intentional discrimination. Id. at 96, 106 S. Ct. 1712. A pattern of peremptory strikes against jurors of a particular race is sufficient to raise an inference of impermissible discrimination. See Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2000); Tankleff v. Senkowski, 135 F.3d 235, 249 (2d Cir. 1998).

Once the defendant makes out a prima facie case of racial discrimination, the burden shifts to the prosecution to provide a race-neutral explanation for the peremptory challenges. Id. at 97, 106 S. Ct. 1712. The proffer of this reason need not be as detailed or thorough as required to justify a for-cause challenge, however, the prosecutor must "articulate a neutral explanation related to the particular case to be tried." Id. at 98, 106 S. Ct. 1712. After considering the direct and circumstantial evidence of a pattern of discrimination, and the prosecutor's neutral explanation for the exercise of particular challenges, the trial court must determine whether the defendant has established purposeful discrimination. Id. A trial court's findings, on

direct review and especially on habeas review, must be given great deference. Id. at 98 & n. 21.

Here, the petitioner alleges that the prosecution impermissibly used its peremptory challenges to exclude two African-American members of the jury in violation of his constitutional rights. In both instances, Judge Weber determined that the defendant failed to establish a prima facie case that the prospective jurors were excluded for racially motivated reasons. To complete the record, the Judge Weber requested that the prosecutor provide its reasons for excluding them.

The prosecutor stated that Yvonne Patterson-Quirk was being excused because of her prior dealings with the defendant's lawyer. Judge Weber did not act improperly in denying the defendant's first Batson challenge regarding this potential juror. This juror was apparently the first African-American to be excused. The Second Circuit has held, in habeas cases, that a state trial court does not act improperly when it denies a Batson challenge early in the jury selection process. Sorto v. Herbert, --- F.3d ---, 2007 WL 706894, at **4-5 (2d Cir. Mar. 9, 2007) (citing Overton v. Newton, 295 F.3d 270, 276, 279 (2d Cir. 2002)).

Assuming the peremptory challenge of Patterson-Quirk could establish a pattern of discrimination, the prosecution provided a race-neutral explanation. Contrary to the defendant's contention, the trial court did not exclude Patterson-Quirk solely because of her membership in the NAACP. This prospective juror stated that

she had prior dealings with the defendant's lawyer. In this Court's view, this is a valid non-discriminatory justification for the use of a peremptory strike.

The Court also does not find that there was a <u>Batson</u> violation regarding the prosecution's use of a peremptory challenge to eliminate Prospective Juror Number Four from the panel. Prospective Juror No. 4 was being excused because the prosecutor believed that if selected to serve she may not be resolute in her decision and may succumb to pressure during jury deliberations because she was a battered spouse. Assuming that the petitioner satisfied the first element of a pattern of discrimination considering the exclusion of both Patterson-Quirk and Prospective Juror No. 4, although the Court has some doubt about whether such a pattern did exist, the prosecution did furnish a race-neutral explanation for excusing this juror. The Court finds no basis to dispute the trial court's findings. Thus, the petitioner failed to establish purposeful discrimination. Accordingly, this <u>Batson</u> claim is denied.

**C.**     **As to the <u>Brady</u> Claim**

The petitioner contends that the prosecution failed to produce exculpatory evidence in violation of his rights under <u>Brady v. Maryland,</u> 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1986). Specifically, the petitioner argues that the prosecution was late in turning over the grand jury testimony of the complainant regarding the lineup identification of the petitioner; that this testimony would have been helpful to him at the <u>Wade</u> hearing because it casts doubt on the victim's ability to identify the

perpetrator; and that because the victim could not identify the petitioner, the line-up must have been unduly suggestive.

To establish a <u>Brady</u> violation, the petitioner must show: (1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the State, either wilfully or inadvertently; and (3) prejudice. <u>Boyette v. Lefevre</u>, 246 F.3d 76, 88 (2d Cir. 2001) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

The petitioner has not demonstrated that a <u>Brady</u> violation occurred or that his due process rights were violated because Mentese's grand jury testimony was not exculpatory. His testimony was that he told the police that they should have the participants in the line-up wear hoods. The petitioner's counsel argued that it may seem to some as though the presence of a hood would lead to a less accurate identification rather than more accurate because less physical features are visible. However, having the the line-up participants wear hoods more accurately reflected the appearance of the perpetrator as observed by Mentese. This is not a suggestive process, provided that all of the participants in the line-up, and not just the petitioner, appeared that way. The testimony of Mentese that he requested the police to have the line-up participants wear hoods does not undermine his identification of the petitioner in this case.

However, even assuming that Mentese's grand jury testimony was exculpatory or impeachment material, the petitioner was not prejudiced by the prosecution's late disclosure of this material. Judge Weber determined that the line-up was not suggestive because all of the participants wore hoods, and that Mentese's testimony before the grand jury would not have changed that determination. Under the AEDPA, this Court must presume that factual findings by the state court are correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Boyette v. Lefevre, 246 F.3d 76, 88 (2d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)). Here, the petitioner failed to rebut this presumption.

Because, as Judge Weber made clear, the timely disclosure of Mentese's grand jury testimony would not have changed the result of the Wade hearing, the only purpose it could have served the petitioner was as impeachment material during trial. As noted above, Mentese's grand jury testimony was made available to the petitioner during jury selection with sufficient time to use it at trial. Indeed, at trial the petitioner's counsel cross-examined Mentese about his statements to Detective Pravetz regarding the line-up participants, hoods, and the portions of the petitioner's face that Mentese claims to have seen during robbery. (Tr. at 639-643.) Thus, the petitioner was not prejudiced by the prosecution's failure to turn over Mentese's grand jury testimony before the Wade hearing. Accordingly, this Brady claim is denied.

### III.    CONCLUSION

For the reasons stated above, Vensel Hardy's petition for a writ of habeas corpus is denied.  Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(c)(2), a certificate of appealability is denied, as the petitioner failed to make a substantial showing of a denial of a constitutional right. <u>Miller-El v. Cockrell</u>, 537 U.S. 332, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).

The Clerk of the Court is directed to close this case.

**SO ORDERED**.

Dated: Central Islip, New York
        March 30, 2007


         _/s/ Arthur D. Spatt_____
              ARTHUR D. SPATT
         United States District Judge